## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **LEROY EDWARD GILBERT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-CV-0308-GKF-JFJ** |
| | ) | |
| **CARRIE BRIDGES,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

### OPINION AND ORDER

This matter is before the Court on Petitioner Leroy Edward Gilbert's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("petition") (Dkt. 1). Having considered the petition and attachments; Respondent Carrie Bridges's Response to Petition for Writ of Habeas Corpus ("response") (Dkt. 7) and attachments; the state-court record (Dkts. 8, 9); and applicable law, the Court finds that Gilbert's claims can be resolved without an evidentiary hearing and denies the petition.

I.      **Background**

On the morning of July 30, 1994, Tosha Goodou, then thirteen years old, returned home from a sleepover at her aunt's house to find her mother, Erma Jean Goodou ("Goodou"), lying on the kitchen floor of their Tulsa home in a pool of blood, nonresponsive and naked from the waist

---

[1] Gilbert is incarcerated at the James Crabtree Correctional Center, in Helena, Oklahoma. The Court therefore substitutes that facility's warden, Carrie Bridges, in place of Tommy Sharp, as party Respondent. Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note this substitution on the record.

down.  Dkt. 1-3, *Gilbert v. State*, No. F-2017-1191 (Okla. Crim. App. 2019) (unpublished) ("OCCA Op."), at 2-3.[2]

The Tulsa Police Department ("TPD") investigated Goodou's death as a homicide. Detectives Roy Heim, Tim Bracken, and Gary Meek found a bent window screen in the backyard of Goodou's house, an open window, and a "smudged shoe print" on the exterior wall under the window.  *Id.* at 3-4.  Based on this and other evidence found at the crime scene, the detectives determined that an individual pried off the window screen, entered the home through the window, and attacked Goodou in her bedroom before a struggle ensued in the kitchen where the individual killed Goodou.  *Id.*  Detective Bracken lifted fingerprints from the window screen and one thumbprint from a living room phone that had been disconnected from the wall.  *Id.* at 4.  The detectives also found a man's watch near Goodou's bed.  Dkt. 8-6, Tr. Trial vol. 2, at 252-53 [421-22]; Dkt. 8-7, Tr. Trial vol. 3, at 126 [581] 140-41 [595-96].  Goodou's autopsy revealed defensive wounds on her hands and arms, numerous sharp force injuries, and blunt force injuries on her head.  Dkt. 1-3, OCCA Op., at 4-5.   Dr. Robert Hemphill, the Chief Medical Examiner, determined that Goodou died from blunt force injuries to her head, the most serious of which fractured her skull and tore the surface of her brain.  *Id.*  Because Goodou was found partially clothed, Dr. Hemphill obtained vaginal swabs during the autopsy and turned them over to the TPD. *Id.*

The investigating detectives compared fingerprints recovered from the crime scene with known fingerprints of several individuals but developed no leads.  *Id.* at 5; Dkt. 8-7, Tr. Trial

---

[2] For consistency, the Court's citations refer to the CM/ECF header pagination.  However, when citing the original record ("O.R.") or transcripts of proceedings in state court (e.g., Tr. Trial vol. 1), the Court also includes, in brackets, the original page numbers when the original pagination differs from the CM/ECF header pagination.

vol. 3, at 128-37 [583-92], 29-30 [484-85].  In 2003, Dr. Valerie Fuller, a TPD forensic analyst, sent several items collected from the crime scene to a laboratory in Texas for testing.  Dkt. 8-7, at 238-42 [693-97].  That testing revealed two unknown male DNA profiles.  *Id.* at 244-45 [699--700].  One profile was obtained from a swab of the watch found near Goodou's bed and a second, different profile was obtained from a vaginal swab taken during Goodou's autopsy.  *Id.* Fuller entered the two unknown male DNA profiles into a national database.  *Id.* at 248 [703].  But Goodou's murder remained unsolved for another decade.

In 2012, Detective Eddie Majors began working Goodou's "cold case" and sent several items collected from the crime scene to the Oklahoma State Bureau of Investigation ("OSBI") for testing.  Dkt. 8-7, Tr. Trial vol. 3, at 210-13 [665-68].  The OSBI, in turn, sent the items to Bode Laboratories in Texas.  *Id.*  at 96 [551]; Dkt. 1-3, OCCA Op., at 5.  Dr. Julie Farragut, a forensic analyst with Bode Laboratories, tested several items for DNA including Goodou's vaginal swabs. Dkt. 8-7, at 64-67 [519-22], 81-91 [536-46].  Dr. Farragut determined that one vaginal swab contained a mixture of Goodou's DNA and DNA from one unknown male contributor.  *Id.* at 81-91 [536-46].  Wendy Duke, an OSBI forensic analyst, received and reviewed the testing results from Bode Laboratories, entered the unknown male DNA profile Dr. Farragut developed from the vaginal swab into the State's DNA database, and "got a hit on [Gilbert's] DNA profile."  Dkt. 1-3, OCCA Op., at 5-6.

Detective Majors interviewed Gilbert in Texas and, pursuant to a warrant, obtained a buccal swab from Gilbert.  *Id.* at 6.  Duke compared the DNA profile from Gilbert's buccal swab with the unknown male DNA profile obtained from Goodou's vaginal swab and with partial DNA profiles obtained from Goodou's fingernails.  Dkt. 8-7, Tr. Trial vol. 3, at 107 [562].  Duke determined that Gilbert was excluded as a contributor to the partial profiles from Goodou's fingernails and

determined that Gilbert's known DNA profile matched the unknown male DNA profile from the vaginal swab. Dkt. 8-7, at 107-110 [562-65]. According to Duke, the unknown male DNA profile from Goodou's vaginal swab was "rare" because "[t]he probability of selecting an unrelated individual at random from the population who could contribute to [that] profile is at least one in 71.8 sextillion." *Id.* at 109-10 [564-65].

Detective Majors also submitted Gilbert's known finger and palm prints to Jason Reeves, a TPD forensic analyst. Dkt. 8-7, Tr. Trial vol. 3, at 3 [458], 26 [481]. Reeves compared Gilbert's known prints with ten unknown prints collected from the crime scene. *Id.* at 26 [481]. Reeves determined that eight unknown prints from the window screen removed from Goodou's window matched Gilbert's known prints, one unknown print from Goodou's living room phone matched Gilbert's known print, and one unknown print from the window screen did not match Gilbert's known prints. *Id.* at 32-50 [487-505]. Reeves compared the unknown print from the window screen that did not match Gilbert's prints with known prints from three other individuals—James Toby, Rashine Gains, and Juan Williams—and Reeves could not rule out the possibility that one of these three individuals left the unknown print on the window screen. *Id.* at 47-48 [502-03], 54-57 [509-12].

In 2015, the State of Oklahoma charged Gilbert, in Tulsa County District Court Case No. CF-2015-2579, with first-degree felony murder and, in the alternative, with first-degree murder with malice aforethought. Dkt. 8-10, O.R., at 20 [15]. Following a four-day trial in September 2017, a jury found Gilbert guilty of first-degree murder with malice aforethought and recommended a sentence of life without the possibility of parole. *Id.* at 180 [175]; Dkt. 8-8, Tr. Trial vol. 4, at 123 [882]. The trial court sentenced Gilbert accordingly. Dkt. 8-9, Tr. Sentencing Hr'g, at 8.

Represented by counsel, Gilbert filed a direct appeal in the Oklahoma Court of Criminal Appeals ("OCCA"), asserting three claims. Dkt. 7-1, at 2. The OCCA affirmed Gilbert's judgment and sentence. Dkt. 1-3, OCCA Op., at 8-17. Gilbert did not seek further review by filing a petition for writ of certiorari in the United States Supreme Court. Dkt. 1, at 2. Proceeding *pro se*, Gilbert filed an application for postconviction relief in Tulsa County District Court, asserting thirteen claims. Dkt. 7-3. The state district court denied the application, Gilbert filed a postconviction appeal, and the OCCA affirmed the denial of postconviction relief. Dkts. 1-1, 1-2, 7-5, 7-6.

## II.     Discussion

Gilbert now seeks federal habeas relief, claiming he is in custody in violation of the United States Constitution because he was deprived of his Sixth Amendment right to counsel at trial and on direct appeal, the cumulative effect of trial errors deprived him of his Fourteenth Amendment right to due process, the State's failure to disclose exculpatory evidence deprived him of his Sixth and Fourteenth Amendment rights to due process and a fair trial, and he is actually innocent. Dkt. 1, at 5-21.

### A.     Limits on habeas review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and Supreme Court habeas jurisprudence limit a federal court's authority to grant federal habeas relief to a prisoner in custody pursuant to a state-court judgment. First, a federal court may grant habeas relief "only on the ground that [the prisoner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). This means that a federal court cannot grant relief if a trial error is based on a violation of state law. *See, e.g.*, *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.").

Second, a federal court may grant habeas relief only if the prisoner has either (1) exhausted available state-court remedies by presenting his federal claim to the state's highest court through available appellate procedures, 28 U.S.C. § 2254(b)(1)(A), or (2) demonstrated that there is a complete absence of available state remedies or an absence of effective state remedies, *id.* § 2254(b)(1)(B).

Third, as a corollary to the exhaustion requirement, the procedural default doctrine provides that if a state prisoner presents a federal claim in state court and the state court denies relief "based on an adequate and independent procedural rule,"[3] without reaching the substantive merits of the federal claim, a federal court may grant habeas relief only if the prisoner first demonstrates either cause for the procedural default and resulting prejudice or that failure to review the claim will result in a fundamental miscarriage of justice. *Davila v. Davis*, 582 U.S. 521, 527-28 (2017); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Fourth, when a state court has adjudicated a federal claim on the merits, a federal court may grant habeas relief only if the prisoner first shows that the state court's adjudication of the claim resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1),[4] or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). Section 2254(d)'s

---

[3] A state procedural rule "is independent if it is separate and distinct from federal law" and "is adequate if it is 'strictly or regularly followed' and applied 'evenhandedly to all similar claims.'" *Duvall v. Reynolds*, 139 F.3d 768, 796-97 (10th Cir. 1998) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982)).

[4] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated by "the holdings" of the Supreme Court's "decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

standards are demanding.  When the state court "'identifies the correct governing legal principle' in existence at the time" of its decision, the only question under § 2254(d)(1) is "whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'"  *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Williams*, 529 U.S. at 413).  To establish that the state court's decision unreasonably applied the law, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  In other words, "a petitioner must persuade a federal court that no fairminded juris[t] could reach the state court's conclusion under [the Supreme] Court's precedents."  *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (internal quotation marks omitted).  Under § 2254(d)(2), a petitioner must show that the state court decision rests on an unreasonable determination of the facts.  But the reasonableness of a state court's factual determination also is measured by *Richter*'s fairminded-disagreement standard.  *Dunn v. Madison*, 138 S. Ct. 9, 12 (2017).  And, "if [*Richter*'s] rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision" and that the federal court may not disturb the state court's decision "without identifying—let alone rebutting—all of the justifications" that may support that decision.[5]  *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (*per curiam*).

Fifth and finally, a federal habeas court may not grant habeas relief unless the prisoner (1) makes any showings necessary to overcome any bars to relief imposed by the AEDPA and related

---

[5]  In addition, when § 2254(d) applies, the federal court's review is limited to the same record that was presented in state court.  *Pinholster*, 563 U.S. at 185.  And a federal court must presume the correctness of the state court's factual findings unless the petitioner rebuts that presumption "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Supreme Court jurisprudence, and (2) demonstrates that any constitutional errors found by the federal court had a "substantial and injurious effect or influence" on the outcome of the state court proceeding. *Davenport*, 142 S. Ct. at 1523-24 (2022) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

With these standards in mind, the Court turns to Gilbert's claims.[6]

**B.      Ineffective assistance of trial counsel (claims one and two)**

In claims one and two, Gilbert contends he was deprived of his Sixth Amendment right to the effective assistance of trial counsel. Dkt. 1, at 5-14. A defendant alleging a violation of his or her Sixth Amendment right to counsel must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. And "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. To establish prejudice the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Gilbert alleges, as he did on direct appeal, that trial counsel performed deficiently and prejudicially (1) by failing to object when the trial court erroneously gave an instruction regarding a state law that requires individuals convicted of certain crimes to serve 85% of any sentence imposed before becoming eligible for parole consideration ("the 85% Rule"), and (2) by failing to object when the prosecutor misstated the law regarding the 85% Rule. Dkt. 1, at 5-14.

---

[6] Because Gilbert appears without counsel, the Court liberally construes the petition. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

Effective July 1, 1999, the 85% Rule provides that:

> A person committing a felony offense listed in [Okla. Stat. tit. 21, § 13.1] on or after March 1, 2000, and convicted of the offense shall serve not less than eighty-five percent (85%) of the sentence of imprisonment imposed within the Department of Corrections.  Such person shall not be eligible for parole consideration prior to serving eighty-five percent (85%) of the sentence imposed and such person shall not be eligible for earned credits or any other type of credits which have the effect of reducing the length of the sentence to less than eighty-five percent (85%) of the sentence imposed.

Okla. Stat. tit. 21, § 12.1 (2023).[7]  When Gilbert was tried in 2017, Okla. Stat. tit. 21, § 13.1 listed

first-degree murder as a felony offense subject to the 85% Rule.  Okla. Stat. tit. 21, § 13.1 (2017).

At trial, without objection, the trial court gave Instruction Number 33, advising the jury that:

> A person convicted of [first-degree murder] shall be required to serve not less than eighty-five percent (85%) of the sentence imposed before becoming eligible for consideration for parole and shall not be eligible for any credits that will reduce the length of imprisonment to less than eighty-five percent (85%) of the sentence imposed.
>
> If a person is sentenced to life imprisonment, the calculation of eligibility for parole is based upon a term of forty-five (45) years, so that a person would be eligible for consideration for parole after thirty eight (38) years and three (3) months.

Dkt. 8-10, O.R., at 178.  During closing argument, the prosecutor urged the jury to find Gilbert

guilty of first-degree murder with malice aforethought then explained the jury had "two options"

for sentencing, "[l]ife or life without the possibility of parole."  Dkt. 8-8, Tr. Trial vol. 4, at 109

[868].  The prosecutor stated, "you have your instructions on what that means.  Life is defined

ineligible for parole – I'm sorry, 45 years, parole with good time credit at 38 and some change.

Life without parole means you die in prison."  Dkt. 8-8, at 109.  Trial counsel did not object to the

prosecutor's statements.  *Id.*

---

[7] The current version of this law uses the same language as the law in effect in 2017, when Gilbert's case was tried to a jury.  Okla. Stat. tit. 21, § 12.1 (2017).

Based on these facts, Gilbert argued on direct appeal that (1) the trial court plainly erred by instructing the jury regarding the 85% Rule because that rule did not apply to a murder committed in 1994, (2) the prosecutor committed reversible misconduct by misstating the law regarding the 85% Rule when he suggested that Gilbert would be paroled "at 38 and some change" if given a life sentence, and (3) trial counsel provided ineffective assistance by failing to object to the jury instruction and the prosecutor's misstatement.  Dkt. 7-1, at 8-14.

The State conceded, and the OCCA concluded, that the trial court erred by giving Instruction Number 33 because the 85% Rule does not apply to crimes committed before March 1, 2000, and Gilbert was charged with committing a 1994 murder.  Dkt. 1-3, OCCA Op., at 9.  But, applying plain-error review, the OCCA concluded that this error did not affect Gilbert's substantial rights and, further, that even if plain error occurred, reversal was not required because the error was harmless.  *Id.* at 9-12.  Before determining the error was harmless, the OCCA rejected Gilbert's position that the jury-instruction error implicated the federal constitutional prohibition against *ex post facto* punishment, declined to apply the constitutional harmless error standard from *Chapman v. California*, 386 U.S. 18 (1967),[8] and instead applied the "state standard for harmless analysis" which, like *Brecht*, asks whether "the error had a substantial influence on the outcome of the case or leaves the Court in grave doubt as to whether it has such an effect."  *Id.* at 11-12.  Applying this standard, the OCCA reasoned the jury-instruction error was harmless because "[t]he jury was informed that [Gilbert] would have to serve 85% of his sentence before he could be

---

[8] Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.

considered for parole when, in-fact, he will be eligible for parole consideration much earlier." Dkt. 1-3, OCCA Op*., at 12.*[9]

Next, the OCCA concluded that the prosecutor's challenged statements "constituted a flat misstatement of the law concerning the 85% Rule" because "[c]omments which mischaracterize the 85% Rule as some form of automatic release are improper." *Id.* at 15.  But, applying plain-error review, the OCCA determined that this error did not affect Gilbert's substantial rights. *Id.* at 15-16.  The OCCA reasoned that because the 85% Rule did not apply to Gilbert's crime, committed in 1994, Gilbert was not required to serve 85% of any sentence imposed, that "he could have been eligible for parole consideration on a life sentence much earlier than 38 and 1/3rd years," and that the jury ultimately decided to recommend a sentence of life without the possibility of parole. *Id.* at 15.

Lastly, applying *Strickland*, the OCCA rejected Gilbert's ineffective-assistance-of-trial-counsel claim. *Id.* at 16-17.  The OCCA specifically found no prejudice, reasoning,

> We have determined in [Gilbert's first two claims] that [Gilbert] had not shown that plain and reversible error had occurred.  The complained errors did not affect the outcome of the case.  As such we find that [Gilbert] has not shown a reasonable probability that the outcome of the trial would have been different but for counsel's failure to object to the prosecutor's comment and the erroneous instruction.

*Id.*

---

[9] In 1994, Oklahoma law provided that the parole board must consider most prisoners for parole after service of one-third of any sentences imposed.  Okla. Stat. tit. 57, § 332.7 (1994); *Mayes v. State*, 887 P.2d 1288, 1317 (Okla. Crim. App. 1994).  This appears to be the source of the OCCA's statement that Gilbert "will be eligible for parole consideration much earlier." Dkt. 1-3, at 12.  However, to the extent the OCCA's statement suggests Gilbert "will be" eligible for parole consideration at any time, that is a misstatement of fact because he was sentenced to life without the possibility of parole.  Regardless, considering the OCCA's statement in context of its entire decision, the Court understands the OCCA's statement to mean that the jury was erroneously instructed that if the jury recommended a life sentence Gilbert would be eligible for parole consideration after serving 85% of his sentence when, in fact, the jury should have been instructed that he would have been eligible for parole consideration after serving only 33% of his sentence.

Because the OCCA applied *Strickland*, § 2254(d) bars relief unless Gilbert shows either (1) that the OCCA unreasonably applied *Strickland* to the facts of his case or (2) that the OCCA unreasonably determined the facts. 28 U.S.C. § 2254(d); *Madison*, 138 S. Ct. at 12. Gilbert appears to argue that it was unreasonable for the OCCA to determine that the instructional error and prosecutor's misstatement of the law did not affect his substantial rights, thus making it unreasonable for the OCCA to determine that no prejudice resulted from trial counsel's failure to object to those errors. *Id.* But the OCCA's decision that Gilbert did not establish *Strickland* prejudice is objectively reasonable under the facts of this case. It is undisputed that the trial court erroneously instructed the jury on the 85% Rule, that the prosecutor misstated the law, and that trial counsel did not object in either instance. But, as the OCCA reasoned, had the jury been correctly instructed on the law that applied in Gilbert's case, the trial court (and the prosecutor) would have advised the jury that if the jury recommended a life sentence, Gilbert would be eligible for parole consideration after only 15 years, not 38 years and 3 months. *See supra* n. 7. Because the jury was faced with the option of recommending either a life sentence with parole consideration at 38 years or a life sentence with no possibility of parole and the jury chose the latter option, it was objectively reasonable for the OCCA to conclude that there was no reasonable probability that the outcome of the proceeding would have been different but for counsel's failure to object to the instruction and the prosecutor's misstatement of law. Thus, to the extent claims one and two reassert the ineffective-assistance-of-trial-counsel claim Gilbert presented to the OCCA on direct appeal, § 2254(d) bars relief and the Court denies the petition as to that claim.

To the extent claims one and two could be construed as also reasserting the jury-instruction and prosecutorial-misconduct claims Gilbert presented to the OCCA on direct appeal, the Court likewise concludes that § 2254(d) bars relief because the OCCA's rejection of those claims is

objectively reasonable.  The OCCA evaluated both claims under its plain-error standard which is no different than the due process standard that federal courts apply to review habeas claims asserting instructional error and general allegations of prosecutorial misconduct.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974) (explaining that federal courts evaluate general allegations of prosecutorial misconduct by considering whether, on examination of the entire proceedings, the prosecutor's allegedly improper questions or remarks, "so infected the trial with unfairness as to make the resulting conviction a denial of due process"); *Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005) (finding "no practical distinction" between the OCCA's plain-error test and "the federal due-process test, which requires reversal when error "so infused the trial with unfairness as to deny due process of law"); *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995) ("A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial.").  The OCCA's decision thoroughly and reasonably explains why the errors arising from the instruction and the prosecutor's misstatement regarding the 85% Rule, in context of the entire trial, did not deprive Gilbert of due process or a fundamentally fair trial.  While the trial court should not have given Instruction No. 33, the instruction itself accurately stated the law in effect at the time of Gilbert's trial regarding parole eligibility, thus mitigating any negative impact from the prosecutor's improper statement suggesting Gilbert would be automatically paroled after about 38 years.  *See Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006) ("The jury is presumed to follow its instructions, even when there has been misleading argument." (internal citation omitted)).  And, as previously discussed, the jury instruction advised the jury that if it recommended a life sentence, then Gilbert could be considered for parole in 38 years and 3 months when, under the law in effect at the time of his

crime, he could have been considered for parole after only 15 years.  It was therefore reasonable for the OCCA to determine that the prosecutor's misstatement did not affect Gilbert's substantial rights and to determine that the jury-instruction error did not substantially influence the outcome of the criminal proceeding.  Thus, to the extent Gilbert's claims one and two could be construed as reasserting the jury-instruction claim and the prosecutorial-misconduct claim that Gilbert raised on direct appeal, § 2254(d) bars relief, and the Court denies the petition as to those claims.

Further, to the extent claims one and two could be construed as reasserting Gilbert's claim that giving an instruction on the 85% Rule violated the Constitutional prohibition against *ex post facto* punishment, the Court concludes that the OCCA's rejection of that claim is objectively reasonable under the law and facts of this case.  *See* Dkt. 1, at 14 (suggesting the trial court "sentenced him under" the 85% Rule, without "jurisdiction" and in violation of "the Constitutional principles prohibiting ex post facto punishment").  As a matter of law, the 85% Rule did not apply to Gilbert because the law creating the rule was not effective when Gilbert committed first-degree murder in 1994.  But, as a matter of fact, the trial court did not apply the 85% Rule to inflict greater punishment against Gilbert when it imposed his sentence.  *See United States v. Womack*, 833 F.3d 1237, 1241 (10th Cir. 2016) (explaining that the Ex Post Facto Clause "prohibits application of laws that 'inflict a greater punishment for the crime than was in . . . place at the time the crime was committed'").  At sentencing, the trial court imposed the sentence recommended by the jury—life *without* the possibility of parole. Dkt. 8-9, Tr. Sentencing Hr'g, at 8.  Admittedly, the trial court referred to the 85% Rule, stating:  "I advise you by law this is an 85-percent crime in the State of Oklahoma, although I don't know that that's particularly applicable to your situation.  But the law defines murder in the first degree as such." *Id.*  First-degree murder is an 85% crime but, as the trial court seemed to acknowledge, the rule did not apply in Gilbert's situation.  This is true for

two reasons.  First, as discussed, the 85% Rule was adopted after Gilbert committed murder in 1994.  Second, Gilbert was sentenced to life without the possibility of parole.  Critically, the 85% Rule applies only when a defendant's sentence includes the possibility of parole.  Under Oklahoma law, Gilbert will not be eligible for parole consideration at any time, much less after he serves any percentage of his sentence.  Thus, as the OCCA reasoned, Gilbert fails to show any ex post facto violation.  Dkt. 1-3, OCCA Op., at 11.  To the extent claims one and two could be construed as reasserting the ex-post-facto claim Gilbert presented to the OCCA on direct appeal, § 2254(d) bars relief and the Court denies the petition as to that claim.

### C.   Cumulative error (claim three)

In claim three, Gilbert contends the cumulative effect of the errors he identified on direct appeal deprived him of due process.  Dkt. 1, at 15-17.  Habeas "petitioners are entitled to 'relief under [the] cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness.'" *Andrew v. White*, 62 F.4th 1299, 1351 (10th Cir. 2023) (quoting *Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013)).  To analyze a cumulative-error claim, a reviewing court "aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Simpson v. Carpenter*, 912 F.3d 542, 602 (10th Cir. 2018) (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)).  But "[o]nly actual constitutional errors are considered when reviewing a case for cumulative error." *Id.*

Respondent contends Gilbert procedurally defaulted the cumulative-error claim because he first raised it in his application for postconviction relief and the OCCA agreed with the state district court's conclusion that Gilbert waived any claims that could have been, but were not, raised on

direct appeal.  Dkt. 7, at 25-29; Dkt. 1-2, at 2; Dkt. 7-3, at 24.  The Court agrees.  The OCCA routinely applies its waiver rule to procedurally bar claims that could have been, but were not, raised on direct appeal.  *See Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008) ("[T]his court has found Oklahoma's bar of claims not raised on direct appeal to be independent and adequate.").

Respondent further contends Gilbert cannot overcome the procedural default of claim three through his assertion of actual innocence (further discussed in claim four), and that he likewise cannot establish cause and prejudice because his ineffective-assistance-of-appellate-counsel claim (also discussed in claim four) lacks merit.  *Id.*  The Court finds it unnecessary to decide whether Gilbert could overcome his procedural default of claim three because it is more efficient to deny this claim on the merits.  *See Smith v. Duckworth*, 824 F.3d 1233, 1242 (10th Cir. 2016) ("[W]here 'the claim may be disposed of in a straightforward fashion on substantive grounds,' [a federal court] retains discretion to bypass the procedural bar and reject the claim on the merits." (quoting *Revilla v. Gibson*, 283 F.3d 1203, 1210-11 (10th Cir. 2002))).  Gilbert argues that even if the errors he identified in claims one and two—the erroneously given jury instruction regarding the 85% Rule, the prosecutor's misstatement of the law regarding the 85% Rule, and trial counsel's errors in failing to object to the instruction and misstatement—are individually harmless, their cumulative effect deprived him of a fundamentally fair trial.  Dkt. 1, at 15-17.  The Court disagrees.  The jury instruction and the prosecutor's challenged statements both misstated Oklahoma law as applied to Gilbert's case, but neither of these errors violated due process.  Similarly, while the OCCA and this Court presumed without deciding that trial counsel committed errors by failing to object to the instruction and challenged statement, without a showing of prejudice, Gilbert has not shown a violation of his Sixth Amendment right to counsel.  Simply stated, this Court found no "actual

constitutional errors" that could be considered in a cumulative-error analysis. *Simpson*, 912 F.3d at 602. The Court therefore denies the petition as to claim three.

### D.  Ineffective assistance of counsel/*Brady* claim/actual innocence (claim four)

In claim four, Gilbert identifies multiple claims. First, he alleges that both trial and appellate counsel provided ineffective assistance, in violation of his Sixth Amendment right to counsel, by failing to challenge the sufficiency of the evidence and by failing to argue that Gilbert is "actually innocent." Dkt. 1, at 19-21. Second, he alleges he is actually innocent. *Id.* Third, he alleges "the State withheld exculpatory evidence and failed to conduct forensic DNA test[s] on other items recovered from the crime scene which pointed to someone other than Petitioner Gilbert" and "the specific scientific evidence is available and remains to be tested if the State wanted to" test it. *Id.* at 21.

### 1.  Ineffective assistance of counsel

Gilbert contends trial counsel and appellate counsel should have argued that the evidence was not sufficient to convict him of murder. Dkt. 1, at 19-22. As previously discussed, to establish a Sixth Amendment violation, a defendant must show trial counsel performed deficiently and, but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *Strickland*, 466 U.S. 692. *Strickland*'s two-part inquiry also applies to claims alleging ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285-89 (2000). In this context, the inquiry focuses on whether the appellant has shown "that a particular nonfrivolous issue" appellate counsel omitted from the appeal "was clearly stronger than issues that counsel did present." *Id.* at 288. Nonetheless, an "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Id.* (citing *Jones v. Barnes*, 463

U.S. 745 (1983)).   And, even if an appellant establishes that appellate counsel performed deficiently, the appellant must show resulting prejudice, i.e., "a reasonable probability that," but for appellate counsel's deficient performance, the appellant "would have prevailed on his appeal." *Robbins*, 528 U.S. at 285-86.

Gilbert's claims that trial and appellate counsel provided constitutionally ineffective assistance rest on his assertions that he is innocent and that the evidence presented at trial is not sufficient to support his murder conviction.   The Fourteenth Amendment's Due Process Clause guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).   When a defendant challenges the sufficiency of the evidence on direct review, the "reviewing court may set aside the jury's verdict . . . only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (*per curiam*) (citing *Jackson*). Gilbert appears to argue that it should have been clear to trial counsel and appellate counsel that the State did not present sufficient evidence at trial to prove his guilt and that, but for his attorneys' failures to challenge the sufficiency of the evidence, there is a reasonable probability that the outcome of his trial and his appeal would have been different. Dkt. 1, at 19-21.   To support his position, Gilbert specifically asserts "[t]here was exculpatory evidence pointing to several other possible assailants"; "[t]here was a man's black watch recovered at the crime scene that did not belong to Mr. Gilbert," that was never tested for DNA evidence, and that "contained none of his DNA"; "DNA evidence does not place Mr. Gilbert inside the victim's house at or during the murder"; and "[f]ingerprint evidence also indicates numerous other assailants." *Id.* at 19-20. Gilbert further asserts he and Goodou were "high school sweethearts," that, around the time she

was murdered, he and Goodou "dated," and he worked for Goodou's property owner and performed home improvement projects at her house. Dkt. 1, at 20. He also asserts that the State tested many items from Goodou's home that did not contain evidence of his DNA, and that investigating detectives "lifted several other prints off of storm screen windows surrounding and around the house" but "[n]one belonged to Mr. Gilbert at that time according to Detective Eddie Majors." *Id.*

Gilbert first alleged trial counsel was ineffective for failing to challenge the sufficiency of the evidence when he filed his application for postconviction relief. Dkt. 7-3, at 6-8, 26. The state district court concluded Gilbert waived this claim because did not raise it on direct appeal, and the OCCA agreed that Gilbert waived this claim. Dkt. 1-1, at 2-3; Dkt. 1-2, at 2. Respondent therefore urges this Court to treat this claim as procedurally defaulted. Dkt. 7, at 31-34. Respondent then liberally construes the petition as alleging that Gilbert can establish cause for the procedural default through his allegation that appellate counsel provided constitutionally ineffective assistance but urges the Court to conclude that the ineffective-assistance-of-appellate-counsel claim lacks merit and thus does not excuse the default. *Id.* at 35-39; *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (discussing "what constitutes 'cause' to excuse a procedural default" and noting that "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice"). The Court finds that Gilbert procedurally defaulted his claim that trial counsel deficiently and prejudicially failed to challenge the sufficiency of the evidence. However, the Court declines to consider whether appellate counsel's alleged ineffectiveness might excuse the procedural default because the state district court effectively considered the merits of the defaulted claim—and the merits of his underlying sufficiency-of-the-evidence claim—in determining whether appellate counsel provided ineffective assistance by failing to raise those

claims on direct appeal.  Dkt. 1-1, at 4-13.  Applying *Strickland* and *Robbins*, the state district court rejected Gilbert's claim that appellate counsel provided constitutionally ineffective assistance by omitting the claims Gilbert first identified in his application for postconviction relief. *Id.*  Specific to his sufficiency-of-the-evidence claim, the state district court applied the *Jackson* standard and concluded that "the record more than reasonably supports a finding of guilt beyond a reasonable doubt" and that "[n]o reasonable appellate counsel would be expected to raise [a sufficiency-of-the-evidence claim] on direct review."  Dkt. 1-1, at 12-13.  The OCCA agreed with the state district court's conclusions (1) that Gilbert waived all claims that he could have, but did not, raise on direct appeal and (2) that Gilbert did not demonstrate that appellate counsel provided constitutionally ineffective assistance.  Dkt. 1-2, at 2-3.  Applying *Strickland* to consider the ineffective-assistance-of-appellate-counsel claim, the OCCA effectively rejected Gilbert's underlying sufficiency-of-the-evidence claim as without merit, reasoning,

> [Gilbert's] jury found him guilty beyond a reasonable doubt after hearing significant evidence that he was present at the crime scene, and after having the opportunity to consider the defenses he tries to present in this matter.  [Gilbert] has not established that his appellate counsel's conduct was objectively unreasonable or that the result of his appeal should have been different.

*Id.* at 3.

In his petition, Gilbert primarily reasserts the arguments he presented in state postconviction proceedings regarding his view that trial and appellate counsel performed deficiently and prejudicially by failing to challenge the sufficiency of the evidence.  Dkt. 1, at 19-21. Because the OCCA rejected Gilbert's ineffective-assistance-of-appellate-counsel claim on the merits—thereby concluding that the omitted sufficiency-of-the-evidence and ineffective-assistance-of-trial-counsel claims alleged in claim four of the petition also lacked merit—§2254(d) bars relief as to each of these claims unless Gilbert first shows that the OCCA's adjudication of the ineffective-assistance-of-appellate-counsel claim was based on an unreasonable application of

*Strickland* or an unreasonable determination of the facts. *Madison*, 138 S. Ct. at 12. Gilbert does not make this showing on the record presented. Having independently reviewed the trial transcripts, this Court cannot say that the OCCA's decision is factually or legally unreasonable. *See supra* section I (discussing underlying facts established at trial). "*Jackson* says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' It also unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Smith*, 565 U.S. at 7 (internal citation omitted) (quoting *Jackson*, 443 U.S. at 319, 326).

As the OCCA reasoned, viewing the evidence in the State's favor, the State presented "significant evidence" of Gilbert's guilt, and the jury had "the opportunity to consider" Gilbert's defenses. Dkt. 1-2, at 3. The State presented evidence that the unknown male DNA profile obtained from Goodou's vaginal swab matched the DNA profile obtained from Gilbert's buccal swab, that Gilbert's finger and palm prints matched eight of the unknown prints lifted from the bent window screen that was removed from Goodou's window, and that Gilbert's thumbprint matched the thumbprint on Goodou's living room phone. Dkt. 1-3, OCCA Op., at 6-7. The State also presented to the jury Gilbert's videotaped interview with Detective Majors. During the interview, Gilbert denied having known or dated any woman named "Erma" and denied familiarity with the neighborhood where Goodou lived. *Id.* at 6-8; Dkt. 8-7, at 224 [679]; Dkt. 9 (State's Exhibit 99). In contrast, Gilbert testified at trial that he attended high school with Goodou, that he knew her as "Jean," rather than "Erma," that he and Goodou had a secret relationship after high

school, that he and Goodou had intercourse a few days or a few weeks before she was killed, that he helped Goodou around the house and "got some screens one time" from Goodou's next door neighbor, and that he used her phone while he was at Goodou's house. Dkt. 1-3, OCCA Op., at 7-8; Dkt. 8-7, Tr. Trial vol. 4, at 267-69 [722-24]. Gilbert denied raping and killing Goodou. Dkt. 8-7, at 269 [724]. Trial counsel also trained the jury's attention on other evidence that could create reasonable doubt as to Gilbert's guilt, including evidence: that Gilbert's DNA was not found under Goodou's fingernails; that Gilbert's DNA profile did not match the unknown male profile obtained from the watch found near Goodou's bed; that Goodou had "safety concerns" about an ex-husband or ex-boyfriend; that investigating detectives initially investigated Sammy Clark because he was seen near Goodou's home on the night of the murder with spots of blood on his shirt; that three other men could not be eliminated as the source of one unknown fingerprint on the window screen; and that seminal fluid could remain in a female's vaginal cavity "[f]ive to seven days" after sexual contact. Dkt. 8-7, at 54 [509], 107-08 [562-63], 134-37 [589-92], 140 [595], 230-31 [685-86] 244-45 [699-700]; Dkt. 8-8, Tr. Trial vol. 4, at 65-76 [825-35].

On this record, this Court finds it was objectively reasonable for the OCCA to conclude that appellate counsel was not constitutionally ineffective either (1) for failing to argue that trial counsel was ineffective for failing to challenge the sufficiency of the evidence or (2) for omitting a sufficiency-of-the-evidence claim from Gilbert's direct appeal. Thus, to the extent Gilbert reasserts the ineffective-assistance-of-appellate-counsel claim he raised in his application for postconviction relief, § 2254(d) bars relief and the Court denies the petition as to that claim. Further, because appellate counsel was not constitutionally ineffective, Gilbert cannot rely on appellate counsel's alleged deficiencies as "cause" to overcome the procedural default of any of his other constitutional claims. *See Carpenter*, 529 U.S. at 451 (noting that to constitute "cause"

to overcome a procedural default appellate counsel's "assistance must have been so ineffective as to violate the Federal Constitution").  And, even if Gilbert could overcome the procedural default of his claims that the State failed to present sufficient evidence and trial counsel provided constitutionally ineffective assistance for failing to challenge the sufficiency of the evidence, the Court would reject both claims on the merits for the reasons just discussed.  Thus, to the extent claim four could be construed as reasserting the ineffective-assistance-of-trial-counsel claim alleging a failure to challenge the sufficiency of the evidence and the sufficiency-of-the-evidence claim Gilbert first raised in state postconviction proceedings, the Court also denies the petition as to those claims.

### 2.    *Brady* **claim**

Next, Gilbert contends in claim four "that the State withheld exculpatory evidence and failed to conduct forensic DNA test on other items recovered from the crime scene which pointed to someone other than Petitioner Gilbert" and that "the specific scientific evidence is available and remains to be tested if the State wanted to" test that evidence.  Dkt. 1, at 21.  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  "[T]o establish a *Brady* violation, a habeas petitioner must show that:  (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense."  *Banks v. Reynolds*, 54 F.3d 1508, 1516 (10th Cir. 1995).

Respondent contends, and the record shows, that Gilbert waived this *Brady* claim by not raising it on direct appeal.  Dkt. 7, at 39-40.  Gilbert first presented this claim to the state district court in his application for postconviction relief, but it does not appear that the state district court

construed the application as asserting a *Brady* claim.  Dkt. 1-1.[10]  Thus, to the extent the state district court considered the *Brady* claim at all, it did so implicitly by denying Gilbert's broad claim that appellate counsel was ineffective for failing to raise "obvious issues" he identified in his postconviction application.  *Id.*  More importantly, in affirming the denial of postconviction relief, the OCCA reiterated that Gilbert waived any claims he could have, but did not, raise on direct appeal, and adopted the state district court's conclusion that Gilbert failed to show that appellate counsel provided constitutionally ineffective assistance by omitting the waived claims. Dkt. 1-2, at 2-3.  The Court thus finds that Gilbert procedurally defaulted his *Brady* claim.

But the Court chooses to overlook the procedural default and reject this claim on the merits. *Smith*, 824 F.3d at 1242; *Revilla*, 283 F.3d at 1210-11.  Gilbert's *Brady* claim fails at the first step because there is no factual support for his apparent assertion that the State withheld exculpatory evidence.  Liberally construing his arguments, Gilbert appears to primarily contend the State withheld exculpatory evidence by failing to identify a suspect using the unknown male DNA profile obtained from a swab of the man's watch that was found near Goodou's bed.  Dkt. 1, at 19-21.  But trial counsel elicited testimony at trial establishing that the watch was found, that the TPD developed an unknown male DNA profile from a swab of the watch, and, most importantly, that the unknown male DNA profile from the watch did not match Gilbert's DNA profile.  Dkt. 8-7, Tr. Trial vol. 3, at 230-31 [685-86], 244-45 [699-700].  And trial counsel emphasized the possibility of other assailants, including the unknown owner of the watch, during closing argument.  Dkt. 8-8, Tr. Trial vol. 4, at 65-76 [824-35].  Assuming the unknown male DNA profile

---

[10]   As he does in his habeas petition, Gilbert buried the *Brady* claim asserted in the application for postconviction relief within his claim that he was denied effective assistance of trial and appellate counsel based on their alleged failures to challenge the sufficiency of the evidence and his assertion that he is "actually innocent." Dkt. 7-3, at 26.

obtained from the man's watch is the "specific scientific evidence" Gilbert relies on to support his *Brady* claim, he cannot show that the State suppressed favorable evidence because trial counsel both knew of and presented to the jury this allegedly exculpatory evidence.  Presumably, the jury found the absence of Gilbert's DNA on the man's watch less compelling than the presence of his DNA in Goodou's vaginal swab and the presence of his fingerprints on the window screen that he removed from Goodou's window before entering Goodou's house and killing her.  To the extent Gilbert claims the State withheld other exculpatory scientific evidence, Gilbert fails to clearly identify what evidence the State allegedly withheld or how it was material to his defense.  For these reasons, the Court denies the petition as to the *Brady* claim asserted in claim four.

### 3.    Actual innocence

Finally, in claim four, Gilbert asserts he is "actually innocent" because he did not murder Goodou.  Dkt. 1, at 19-21.  Aside from discussing evidence presented at trial that he asserts pointed to "other assailants," Gilbert states that he could not have killed Goodou because he "was presumably in Tulsa County jail" when she was killed.  Dkt. 1, at 20.  Even liberally construing the petition, and Gilbert's *pro se* application for postconviction relief, it is difficult to discern whether he claims he is factually innocent or whether he is instead claims he is legally innocent because, in his view, the evidence is not sufficient to support his murder conviction.  Dkt. 1, at 19-21; Dkt. 7-3, at 26.  To the extent Gilbert claims he is factually innocent, he fails to state a cognizable habeas claim.  *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.").  Thus, to the extent claim four could be construed as asserting a freestanding actual-innocence claim the Court denies the petition as to that claim.

Moreover, while Respondent argues that some claims are procedurally barred, the Court declines to consider whether Gilbert's assertion of actual innocence permits review of any procedural defaulted claims. *See Perkins*, 569 U.S. at 392 ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief."). As previously discussed, each of the procedurally defaulted claims lack merit.

In any event, Gilbert does not present a credible claim of actual innocence that would excuse the procedural default of his claims. "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Fontenot v. Crow*, 4 F.4th 982, 1030 (10th Cir. 2021) (alteration in original) (quoting *House v. Bell*, 547 U.S. 518, 537-38 (2006))), *cert. denied*, 142 S. Ct. 2777 (2022). The only arguably "new" evidence Gilbert alludes to is his equivocal assertion that he might have been in jail when Goodou was murdered. The evidence presented at trial established that Goodou was killed between the evening of July 29, 1994, and the morning of July 30, 1994. *See supra* section I. The State elicited testimony at trial from Gilbert establishing that he had a prior felony conviction for larceny from a house and that an arrest warrant was issued in that case on June 22, 1994. Dkt. 8-7, Tr. Trial vol. 3, 272-73 [727-28]. But Gilbert denied that he committed the alleged larceny in that case on July 31, 1994, and the State did not ask him if or when he had been arrested on the outstanding warrant. *Id.* In a letter Gilbert submitted to this Court on July 12, 2021, Gilbert asserts he was arrested on July 31, 1994. Dkt. 10, at 3. In addition, the Court takes judicial notice of records available to the public through the Oklahoma State Courts Network showing that the State charged Gilbert with committing larceny from a house in an information filed June 22, 1994, that an arrest warrant was

issued that same day, and that Gilbert was in state custody on August 1, 1994.  *State v. Gilbert*, https://www.oscn.net/dockets/GetCaseInformation.aspx?db=tulsa&number=CF-1994-3016&cmid=219203, last visited April 28, 2023.[11]  To the extent Gilbert contends evidence that he was arrested on July 31, 1994, is new and should have been presented to the jury, this is not credible evidence of his actual innocence because it shows only that he was arrested *after* Goodou was killed.  Thus, even if this Court did address Gilbert's assertion of actual innocence as a gateway-innocence claim, the Court would not find his claim sufficiently credible to permit review of any procedurally defaulted claims.  *See Fontenot*, 4 F.4th at 1031 ("To be credible, a claim of actual innocence requires a petitioner to present 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995))).

## III.    Conclusion

Gilbert has not shown that this Court should exercise its equitable discretion to grant federal habeas relief as to any claims he raises in the petition.  *See Davenport*, 142 S. Ct. at 1524 (discussing federal courts' discretion to grant habeas relief, as limited by the AEDPA, and stating that "a federal court must deny relief to a state habeas petitioner who fails to satisfy either [the Supreme] Court's equitable precedents or AEDPA.").  The Court therefore denies the petition. Further, because reasonable jurists would not debate this Court's assessment of Gilbert's constitutional claims, the Court declines to issue a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(2) (providing that a district court may issue a certificate of appealability "only if the

---

[11] "[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."  *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979).

[petitioner] has made a substantial showing of the denial of a constitutional right"); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) ("A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.").

**IT IS THEREFORE ORDERED** that the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("petition") (Dkt. 1) is **denied**, and a certificate of appealability is **denied**.  A separate judgment shall be entered herewith.

**IT IS FURTHER ORDERED** that the Clerk of Court shall note on the record the substitution of Carrie Bridges in place of Tommy Sharp as party Respondent.

**DATED** this 3rd day of May, 2023.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE